The Illinois Appellate 450 vision is now in session. The Honorable Justice Mary Ellen Tyler is now recited. Please be seated. The clerk will call the case that is on the docket. 1-22-0322 People v. Justice Smollett Good morning everyone and welcome to the First District of the Illinois Appellate Court. I would ask the attorneys who are going to be arguing this morning to approach the podium and please introduce yourselves and identify the clients that you are representing this morning. Good morning, Judge. Good morning, Justices. I'm so sorry. I'm Manuel Luce, N-E-N-Y-E, last name U-C-H-E. Judge, I represent the Defendant Appellant, Mr. Justice Smollett, who is also in front to the back of us. And my colleague, Miss, I will let her introduce herself. Good morning. Heather Middell, W-I-D-E-L-L, also representing Mr. Smollett. Who is going to be arguing for Mr. Smollett? We intend, if it's okay with your honors, to split arguments depending on which questions your honors have. Well, generally we have one person arguing on behalf of a party. Judge, we had an administratively called ahead of time and we both filed an appearance for argument. We did look at the rules. We did see it's a 20-minute policy on this court. I'm not sure. But we're going to split it up 10-10. And I have two issues and she has two issues. If that's okay with your honors, that's how we prepared. I apologize. I understand that the rule does not favor divided arguments. But if it's okay with the court, we have prepared this. All right. I won't allow you to do that. Sorry. Okay. As you have indicated, and I am confident that prior to indicating, you already know. I'm sorry, counsel. I apologize. Good morning, your honors. Sean Weber on behalf of the state. Thank you, Mr. Weber. Again, we allow 20 minutes for each side. If necessary, we may give you a little more time. But we ask that you try to stay within the time allotted. Mr. Ochi, how much time would you like for your rebuttal argument? Ten minutes. And I presume one person is doing the rebuttal. Yes. Absolutely, yes. Okay. Thank you. Well, with that, you may be seated, counsel. And whosoever is going to be arguing first, you may proceed when you're ready. Thank you, Judge. May it please the court. Public outrage against the defendant cannot overrule the rule of law, specifically due process. In my time before this court, I'll be focused on two issues raised in LPL, the contractual issue, as well as the double jeopardy issue. My partner, Ms. Waddell, who has already introduced herself, will be focused on the appointment of special prosecution issue and the Brady violation issue. So specifically, justices, specifically regarding the contractual issues, I'll be focused on two main points as a roadmap. The first point is that contractual principles apply irrespective of due process based on people versus parks. And Mr. Smollett did complete the terms of his contractual obligation. So we'll be asking this court to enforce an already enforced agreement or reinforce what was already ratified and enforced in the circuit court already. The second point I'll be making as to the contractual issue is that Mr. Smollett's reliance on the contractual agreement, his performance, not just substantial performance, but specific and complete performance, did have constitutional implications based on people versus Sapinski, which I also cite in my brief. Starting with the contractual issue, the Illinois Supreme Court... May I ask you a question? Yes, Judge. Other than the court proceeding in the circuit court of Cook County, is there any other reference in the record to this alleged agreement that you make reference to? Judge, no. Just the only reference to the agreement is what the prosecutor at the time stated on the record prior to dismissal of the first indictment. So you can see that that is the only indication in this record that relates to, describes, or in any other way references this agreement? Correct, Judge. Thank you. Thank you. Well, isn't it a fact that in Judge Truman's order there was a mention of the discussions that had been going on since February 2019? Yes, Judge. There were references to that. But in addition to those references, I think those references were crystallized in the prosecutor's final statement to the trial court prior to the dismissal of the first indictment. And I think the focus really is on whether or not there was a contractual agreement. In people versus Sparks, the Supreme Court stated that prosecutors or the prosecution must honor the terms of the agreement, especially if the defendant has fulfilled his own part of that agreement. We're talking about cooperation agreements, right? Someone has agreed to testify in exchange for the dismissal of the prosecution against them. Judge, that was more Stepinski. In Sparks, having a different type of agreement. In Sparks, the defendant was facing armed robbery charges. The prosecutor said, hey, listen. Allegedly, because they had to do it in evidentiary hearing, the prosecutor approached Sparks and said, if you perform, if you submit to a polygraph test. Yes, we will dismiss this, allegedly. The defendant performed the polygraph test, submitted to it, and passed. But yet it wasn't dismissed. He was later convicted, went all the way to the Illinois Supreme Court. What's interesting about Sparks, Judge, in terms of your question, is three takeaways from Sparks. Number one, Sparks applies a contractual principle within the criminal law context, irrespective of due process. If you read the Sparks opinion, there is no mention about due process in that opinion. It's a strict contractual application. The only thing the court in Sparks was concerned about was whether this is Sparks. It was an offer acceptance and whether there was consideration, which leads to this. Mr. Machay, wasn't the court also concerned with the fact that the defendant had waived his right to incriminate himself? That's true. Justice, that's very important because in the consideration aspect of people versus Sparks, the court did look at that. And what's interesting about that is they're saying, you know, he submitted himself to Fifth Amendment exposure when he did a polygraph test. But if we look at what the dissent says and the dissent in Sparks complains about, they, the judge, justice in that dissent, complained that that Fifth Amendment exposure was not a right because polygraph tests in this state are not admissible in trial. And that really emphasizes the point of Sparks. The courts did not care in Sparks whether or not that Fifth Amendment had become a right, whether it could be used. What they focused on was in preventing the nullification of the criminal justice bargaining system wherein prosecutors make promises and their promises are not kept. So the court's focus, the majority's focus when they addressed the dissent's concerns was, we don't really care that his Fifth Amendment exposure didn't ripen at that point. What we focused on is whether or not there was an agreement, which leads to the next point. Within the Sparks case, Your Honors, the justices heavily relied on a case from Michigan wherein that case was Moshe State, Nollie Cross. And I bring this up because I anticipate that a special prosecutor is going to argue that a Nollie prosecute somehow dampens the contractual obligations. Well, the Sparks case's entire foundation is based on that Nollie Cross case, and they didn't concern themselves with whether or not the case had been Nollie Cross. In fact, Your Honors, within the Sparks case, they actually cite to the Nollie Cross case from Michigan, and they state, in our view, a pledge of public faith in the instance gave force to an unwise agreement, which became Biden upon trial approval of Nollie Cross. Law enforcement processes are committed to civilized courses of action. When mistakes of significant proportions are made, it is better that the consequences be suffered than that civilized standards be sacrificed. So Sparks was referencing the Michigan case wherein the prosecutors dismissed the charges in an aggravated assault case and a torturous case to a child, but brought it back when they realized that the polygraph examination given to the defendant was flawed. And so what that Michigan Supreme Court was telling the prosecution in that case was, we don't care whether you on reflection feel this deal wasn't good enough based on some flaw, or it's wrong that there's outrage, what we care about more importantly is the rule of law, making sure that prosecutors keep to their word. And so that was what that case was about. That's the essential holding of Sparks, which is contractual rights of parties will be enforced. Now, in application to this case, Justice, you earlier pointed out, and correctly so, about the prosecutor's statements to the trial court. And that's very important. The prosecutor states, we believe this outcome is a justice position and a fair resolution to this case. So she uses two different terms here. She uses firstly disposition, which is a technical term to end a case in criminal court. And then she uses fair resolution, which spells finality. And we know this is what she meant because we already quoted the special prosecutor's statement in his information release in C-727, where he states, in reflection of this case, prior to charging Mr. Smollett a second time, we disagree with how the CCSAO's resolved the Smollett case. Again, we're using terms such as resolve. But, Mr. Uche, whatever the special prosecutor said in any press release, you may be citing it, but it's not part of the record and it's not part of what the prosecutor said before the court. Justice, that's fair enough. That's fair enough. I guess I was citing to it mainly because it's technically part of the record. It was part of attachments in motions that were filed. But putting that aside, the foundation of my argument is not rested on what Mr. Webb said. I think I was more reinforcing the point that everyone knew this case was resolved. What's more important, however, is what was said in court. You have a situation where a prosecutor told a judge, Mr. Smollett has agreed to give up $10,000 bail bond. Mr. Smollett has performed community service. In exchange for this, we are motion state non-repulse in this case. And we believe the extra step was taken where she makes the statement, we believe this would be a fair disposition and just resolution. Mr. Hucheng, you make reference to community service. There's no reference in that sentence that the prosecutor said at the time of dismissal that says Mr. Smollett performed X amount of hours of community service in exchange for or in return for. And in fact, the prosecutor says in light of or including Mr. Smollett's volunteer service in the community, there's no reference to an exchange for 10 hours, 15 hours, 100 hours of community service. This is being done. Justice, that's a very fair position. However, it brings back to our point we've been making from the trial court level. In the Starks case, the case was not ruled in favor of the defendant. It was sent back for an evidentiary hearing. In the trial court proceedings, we asked at the very least for an evidentiary hearing when we filed our initial motion, apart from asking for the case to be dismissed. So I guess the response to that question is if there's any question, apart from the fact that we have case law that shows ambiguity should be resolved in favor of the defendant. But if there's any question as to whether or not the community service was part of that agreement, that's something an evidentiary hearing will cure. After all, in the Starks case, the Supreme Court specifically called out the fact that the prosecutor could have been summoned to the courtroom to be questioned and examined in an evidentiary hearing as to what exactly the agreement was. That's why they kicked it back. But nonetheless, our position is even aside from the community service, standing alone on the bail bond, the contractual agreement existed, and that is enough consideration on its own, that bail bond, that $10,000 bail bond. There's nothing that a nollie pros indicates or signifies that prevents the prosecution from resurrecting a case. Would you agree with that? Judge, generally, yes. But as I said in my brief, a nollie pros does not give a prosecutor unfettered ability to bring back a case. The courts also look, in terms of a nollie prosecute, they look to see whether or not that case, whether there's fundamental fairness, whether there's a showing of harassment or bad faith. Why is that important? Because the prosecutor went back to this question of fairness, which is essentially what this case is about. On one hand, one might make the argument, hey, the prosecutor said motion to state nollie pros. At the same time, she said just resolution. So which one is it? Well, the reality is we have to look at the intent of the contractual parties in this particular case. That's what the Smith case did. They looked to the intent of the contractual parties. That's what Stepinski did, and that's what Starks did. And they all said, all these cases, if the justices are in some sort of confusion as to which one did she mean, we have two options. We either have an evidentiary hearing, it gets remanded for an evidentiary hearing, to determine from the prosecutor the horse's mouth exactly what her intent was, or ambiguities are resolved in favor of the defendants within the contractual agreement. But in spite of those things, I don't believe that there's any ambiguity. Had the prosecutor stated, Justice Navarro, case dismissed, Mr. Smollett has performed community service, he has agreed to give himself his bail bond, case dismissed, motion to state nollie pros. I think that would be right for an evidentiary hearing, because one might argue she just said motion to state nollie pros, and that means she could potentially bring it back. I think you need to wind up on this argument and research that. Justice, even if it's unauthorized, the last point I'll make is, even if somehow the prosecutors were unauthorized to execute this agreement, go back to the Sapienski case, where that case specifically stated whenever there are constitutional consequences, a defendant's contractual agreement and rights will be upheld. In this case, the constitutional consequences are obvious. Mr. Smollett gave up his property bond. If you were to take up the community service as being part of that agreement, it curtailed his liberty. His substantive due process rights were also affected, because in Sapienski, the court said it's always affected whenever there is arbitrary action or fundamental unfairness from the state. And in this case, of course, as we've argued in our brief, the act of taking someone's property bail bond, $10,000, promising them a dismissal, dismissing the case, and coming back, I would believe that's obviously fundamentally unfair. Justice, in terms of my second point, so the second issue, I apologize. I think you need to proceed and conclude your part of this argument. Justice, I apologize. I apologize. I would just say in terms of the double jeopardy issue, we've already talked about that. In our brief, our position is that three prongs, in terms of the punish, multiple punishment prong, our position has always been jeopardy attaches once that punishment is given. So that's why I apologize. Thank you. No apologies necessary. Good morning, Justices. Good morning. As Mr. Uche said a moment ago, I'm Heather Waddell. I'm going to discuss with the court the issue of the appointment of a special prosecutor and the issue of the Brady violation or discovery violation by the Office of the Special Prosecutors not turning over statements given by the Ossondagro brothers to the Office of the Special Prosecutor. Now, as the court is aware, the appointment of a special prosecutor in this case is somewhat of an interesting situation. The appointment came only after the case that we had originally before the trial court had been brought to charges, prosecuted, and dismissed according to the satisfaction of the parties. It was not a process, my colleague just said, and the court, Judge Watkins duly dismissed the case per the terms of the state and the defense agreement. Now, again, only after that happened was an appointment for a special prosecutor requested. It was requested by an uninterested party, which is also unusual, and not provided for an allowance for that by the statute. The statute is very clear that there are only three ways in which a special prosecutor can be appointed to a case. The first is where the state's attorney is sick, absent, or otherwise unable to fulfill her duties as a state's attorney. The second is where there is an actual conflict, not potential for one, but an actual conflict that can be shown. And the third is where the state's attorney herself recuses herself by a formal petition. Now, Ms. Waddell? Yes. I guess I'm concerned. We're having a lot of discussion about the proceedings that were before Judge Tuman that were under the 19MR number, correct? Correct. And he issued orders under that 19MR number, correct? Yes, correct. And Mr. Smollett's attorneys chose not to appeal any of Judge Tuman's orders under that MR number, correct? That is my understanding, correct. Okay. I just want to make sure I understand that. Yes, Judge. And to address that issue, Mr. Smollett attempted at several different times during that 19MR case to intervene, to become an intervener in the motion to see if his rights could be, since they were affected, to try to see if he could challenge the appointment and be an intervener or be a defendant. And he was denied those opportunities each time he tried to intervene. Right. And he didn't appeal that denial at any of those times? That is correct. He was charged, however, after six months after the final order. So a 30-day date had passed when a final appealable order would have been able to have been appealed. Explain that to me again. He was charged six months after the appointment of the special prosecutor. That's correct. But he could have appealed the appointment of the special prosecutor, 30 days, within 30 days of that order. He could have if he was a party to the order. He was not. He was not an intervener. He was not a defendant. He could have appealed. Nevertheless, he had an interest in those proceedings, correct? Judge Tuman thought otherwise from all of his orders. But the appellate court could have ruled differently. That is correct, Judge. And he chose not to appeal that order? The attorneys and he chose not to appeal that, correct. Okay. Yes. Be that as it may, his interests, having the special prosecutor be appointed, became affected the moment he was recharged under the new case number after the nollie cross of the first case. But he had an interest in the proceedings. Arguably, he had an interest in the proceedings. We wouldn't know that or whether that issue was ever brought before this court. But that could have been brought before this court. That, in fact, that could have been asked of this court to rule, does he have an interest in these proceedings?  That is correct, Judge. And the decisions of the attorneys and Mr. Smollett before the case was recharged were their decisions. I believe that it had something to do with understanding whether or not Mr. Smollett's interests and rights were ripe at the time after the special prosecutor was appointed but before he was recharged under the new case number. Couldn't you have made all of those arguments, counsel, had you filed an appeal? Yes, they could have made those arguments, Judge. You are absolutely correct. The position we are in now, however, doesn't undo the fact that the appointment of the special prosecutor to re-prosecute a case that, again, had been nollie crossed and dismissed to the satisfaction of the parties was done completely contrary to statute. And the statute, again, is very specific. And the only subsection of the statute that was even addressed by Judge Tuman, the 815 section where the state's attorney recuses herself was not even appropriately applied. But Judge Tuman did concede that the first two sections, whether the state's attorney was sick or absent or unable to fulfill duties, or the second of an actual conflict, that those did not exist. He relied solely on the third subsection saying that the state's attorney recused herself. And it's our contention that she specifically did not, that the statute requires that the state's attorney file a formal petition. It says that the state's attorney may file, which is permissive language, which, of course, if she would like to file one, at that point, once it's filed, then the court is required. The court shall then appoint a special prosecutor. Once, if one is not filed, then the judge has no jurisdiction to appoint a special prosecutor. There is no other subsection in which a judge can appoint a special prosecutor. Isn't it a fact that what the state's attorney did was basically a screening? She screened herself off of the case based on any perception? And since this is a public perception case, that's the only reason we are here now, because of some public outcry, that she screened herself off due to a perception of appearance of impropriety. She did not recuse herself. That's correct, Judge. That is our absolute belief that she said, I personally, not my entire office, but I, Kim Fox, am taking myself away from this matter because of the appearance of potential impropriety or potential that I know some of the witnesses that may be part of this case. So there was no intention of Ms. Fox to recuse her entire office or recuse herself as state's attorney. All of the assistant state's attorneys that are still part of the Cook County State's Attorney's Office were able, willing, capable, and did, in fact, prosecute the case, and it was completed. So, again, we, it is our contention that the, specifically, the way Judge Tuman appointed a special prosecutor was completely violative of all parts of the statute. Further, A-20 requires that Judge Tuman would have contacted public agencies throughout the state, the Attorney General's Office, other counties' state's attorney's offices, appellate prosecutor's offices. Can I ask you something? Yes, Justice. I'm curious about what Judge Tuman did in another case, a different case from the cases before us. What authority are you relying on in arguing to this court gives us any jurisdiction or authority to consider things that happen in a different proceeding, not before this appellate court in this proceeding? The trial court judge in the case that is pending before this court did note, after Mr. Smollett indicated, after the attorneys on the trial attempted to address the issue, as we believe that that was his only method of challenging the appointment of the special prosecutor by the time the case was before Judge Lane in the trial court, and he said, I will point out if it ever becomes necessary, now you have an appealable issue because now we're talking about something you filed in this court, and if you should ever have to go to court of review, it's preserved. Any other questions besides those comments? No, Justice. No, Justice. Thank you. I would ask you now to move on to your second argument. I will move on to my second argument. Thank you. The issue of the Brady violation is very severe. We have a situation where the Office of the Special Prosecutor had two witnesses, two star witnesses, the Ossendiro brothers, and they had discussions with them, an hours-long interview with both brothers, at which point they took notes. Obviously, they had interviews with the brothers. These notes and statements from the brothers from these interviews were never turned over to the defense. They were never even turned over to the court for an in-camera review. What happened was the court simply took the word of the Office of the Special Prosecutors that the notes were completely work product and did not need to be turned over. We have no idea what's in these notes. It could be entirely exculpatory evidence, but it's completely violative of Brady. The notes, the statements, anything that was given to the Office of the Special Prosecutor by either of these brothers in their statements are discoverable evidence. They do not have any sort of attorney-client privilege, obviously, with these witnesses. They are not... Well, they're discoverable if they're actual notes of an interview. If they're simply the work product, if they're simply the notes of an attorney regarding legal strategy, they're not discoverable. That's absolutely correct. So you're saying that these are notes. These notes are, in fact, statements of the witnesses. What I'm saying, Justice, is that we have no way of knowing that because Judge Lynn did not perform an in-camera review of these notes and of these statements. We do know that... There was an inquiry of the attorneys regarding the notes, right, whatever these notes are. There was an inquiry in as much as what are the notes, and the Office of the Special Prosecutor said they're work product. And that was it. And we are aware that there was an hours-long interview with the brothers at their office and that any other information we don't have, because, again, these notes were not turned over even to the court for an in-camera review to decide whether or not they were all entirely work product or if there was any discoverable evidence within them. The defendant did request an in-camera review. That is correct. And that was declined. That was denied. Exactly. So we would... The resolution on that would be it could be sent back for an evidentiary hearing or an in-camera review of these notes. But, again, since we have no idea what's in them, it should be resolved in favor of the defendant. As denying, again, the opportunity to even observe what else could possibly be in these notes, it could be entirely exculpatory evidence. And so we believe that if nothing else, it should be sent back for an in-camera review of the notes, because otherwise it is a strict Brady violation of not turning over discoverable evidence. Thank you. Any other questions? Any other questions from the panel members? Thank you. Thank you, counsel. Mr. Weaver? Good morning, Your Honors. May it please the Court. Counsel, I'm Sean Weaver on behalf of the athlete, the State of Illinois, and the OSB. Your Honors, this Court should affirm Mr. Smollett's felony convictions and sentence. During the two-week trial, the jury was presented with an overwhelming amount of evidence that established Mr. Smollett orchestrated a fake hate crime and falsely reported it to the Chicago Police Department as a real hate crime. Mr. Smollett took the witness stand in his defense. He presented a significant amount of evidence from other witnesses who testified on his behalf, and the jury carefully deliberated for over two days and convicted Mr. Smollett. Yet Mr. Smollett's appeal, at least on papers, has presented dozens of purported issues arising from all phases of his case. However, none constitute an abuse of discretion, and none constitute error that would warrant reversing the conviction or the sentence. And Mr. Smollett has honed in on their bifurcated argument on four major arguments that they've presented, and I'll just go on those four and present my argument in opposition. I'd like, though, to begin by focusing, I think, on the second issue that came up, or perhaps it was the third, as it relates to the matters occurring in the 19MR case. I think it's important, as we do in our brief, to start where I think this Court must, which is its jurisdiction analysis. And first has to determine, as it relates to issues arising in the MR case, does this Court have jurisdiction? And if we set forth and actually cite the law to, which is that this Court doesn't have jurisdiction to sit on top of orders issued in other cases, the 19MR case, that was the Judge Tewin case, that cannot be collaterally attacked in this Court. This Court's jurisdiction stems from the 20CR case. And we cite law, including First District law, that stands for the proposition that simply putting issues into a notice of appeal cannot vest jurisdiction in this Court. And we cite law that actually says that case numbers actually matter, and that's true. So this Court, while it can obviously peek under the covers if it wants to hear about it, it's all over the briefing, of course. The record is enormous. But this Court does not have an ability to sit in a de novo review over the appointment order at large or the order appointing Mr. Webb specifically or the motion for substitution of Judge for cause. That was when they tried to strike Judge Tewin. Mr. Weber, how do you respond to counsel's argument that he was denied the right to intervene in this proceeding, that the defendant was denied that right? Well, he was absolutely denied no right to intervene. I mean, he had filed motions. He appeared at all the hearings. He did file a motion for intervention, which Judge Tewin did deny. However, he had an ability, as Justice Navarro has pointed out, he had an ability to appeal those orders and could have appealed those orders and decided not to. He made specific strategic decisions, which are not in the record. I have no idea why they didn't, but clearly they had an ability to do so. In fact, when they brought different issues back to Judge Tewin, he made it express. This was not meant to be an interim order. He teed it up for them as a final appealable order, and they could have. In fact, what they did was made a strategic decision to just wait and see. That's what they did, to just sort of wait and see to see what would develop. And what developed was, and we'll talk about it in a moment, which was the second prosecution. But they did decide to do a different sort of end around this court. They went to the Illinois Supreme Court under a different rule, the 383 rule, asking for a supervisory order. And while the court, the Illinois Supreme Court, and these were the same issues, by the way. They asked the Illinois Supreme Court to vacate Judge Tewin's 2019 order, just the appointment at large. They asked to vacate Dan Webb's appointment as a specific special prosecutor. They asked him to dismiss the 2020 case, so the 20CR case. And they actually asked the Illinois Supreme Court to vacate all further proceedings. So they made these exact same arguments in a couple of different courts. End rounding this court, which it could have directly appealed if it wanted to, but going to the Illinois Supreme Court. And while the Illinois Supreme Courts took significant briefing on that, the opinion came out just denying the 383. But I think it's fair to at least directly infer that had the Illinois Supreme Court thought that Judge Tewin had end rounded his authority or that had made some discretionary error that was not in the interest of justice, that the Illinois Supreme Court could have, in fact, I would respectfully suggest, would have entered a supervisory order before the case proceeded. So in sum, this court's jurisdiction is limited to the 20CR case. And Mr. Spillett cannot, and I don't believe this court should entertain, the purported grievances from other cases that have been filed throughout the Illinois judicial system over the last five years. This is not an airing of all grievances that happens to Mr. Spillett. This is a very specific, very specific order as it relates to the 20CR case. So I don't believe this court has jurisdiction. But even if this court, even if this court wants to entertain additional arguments, and I'm not suggesting that the entire appeal is gone, okay? What I'm saying is honing in on the 20CR aspects. And so they then bring into the second issue these conflicting framings. I'm not talking about the supposed contract argument, the due process argument that you see in the briefs. And it all stems from what they call this purported deal made with the Cook County State's Attorney's Office in March of 2019. And Mr. Spillett has had a lot of lawyers, okay? And he's entitled to have a lot of lawyers. But what's clear in the record is this. They can't make up their mind on whether they want to land on this argument. They've told other courts that it's analogous to a negotiated plea agreement. These are their quotes. That it was effectively pretrial diversion, whatever happened in 2019. And that it is, in fact, an immunity-type agreement. That's what they said in the papers. But then before this court, they said, I got it. Here's where we're going to land. It's going to be a, quote, non-prosecution agreement. If we land a non-prosecution agreement. So they went all in on this before the record before this court on their actual papers. But if you actually look at the record, not just pontificating about what's in the record, but actually look at the record, Smollett bargained for and received a NALPROS, full stop. Illinois law is crystal clear. We cite Illinois Supreme Court law. And it's to make the case that a NALPROS will not bar another prosecution for the same offense. And when you look at what actually happened, the Cook County State's Attorney's Office advanced the status hearing, and they made a motion for NALPROS. We cite the actual record. ASA Reiser Lanier states, quote, the state's motion in regards to the indictment is to NALPROS, end quote. And there is no evidence in the record to support this concept that this is a non-prosecution agreement. And it's a little bit too cute by half, by the way. Because if you were to actually look at what their own lawyers were saying at this point in time, they were saying that there was no deal. They were saying there was no deferred prosecution. The motion was to NALPROS. And in sum, under Illinois law, Mr. Smollett did not bargain for or receive finality. Okay? He did not bargain for or receive finality. Rather, he bargained for and received a NALPROS. And that left the door open. And it absolutely left the door open for re-prosecution. And the fact that he's upset about that now, I get it. But this court can't overturn it as it relates to the concept of whether or not a NALPROS can be susceptible to a re-prosecution, which dovetails, by the way, into the third argument, which got a significant amount of paper by the appellate and only a little bit of argument here due to the timing issue, is the Fifth Amendment argument on double jeopardy. And I think in sort of the average Jane and Joe Publix mind, this issue has just permeated the media. It just has got this concept because you have a first and you have a second. I respectfully suggest the following. I don't think any of these issues, as I said before, rise to the level of overturning anything that happened in the 20CR case. But this actually might be the easiest one to just deal with and deal with just directly. It's law school 101. It's U.S. Supreme Court and Illinois Supreme Court law. And it's also logic. The starting point in any double jeopardy analysis is, of course, determining whether or not jeopardy had attached. And the Illinois Supreme Court, we cite the Bellmeyer case, tells us that. And because jeopardy never attached, due process are stricter. The double jeopardy claim must be rejected. It must be rejected. And it's not hard because regardless of what occurred down below, and if you're looking at the papers, we know that Illinois and Supreme Court law tells us three things in when jeopardy attaches. By the way, none of which, unequivocally, none of which occurred in the lower court. One, it attaches when a jury trial, when the jury's impaneled and sworn. No dispute there, right? So no dispute that there was not a jury trial in the 19CR case. In a bench trial, when the first witness is sworn and the court begins to receive evidence. Okay, no dispute there. The third is at a guilty plea hearing, when the guilty plea is accepted by the trial court. There's no dispute there. Mr. Spillett has never made a single statement to suggest that he has accepted guilt in this case, not at any trial court level, not at any appellate court level. And whatever occurred before Judge Watkins, this much is clear. He did not accept a guilty plea, and he didn't institute a punishment that you would normally see at a trial court. He accepted the NALPROFs, and the case moved on, and the case was gone. So I respectfully suggest that this court cannot set aside the jeopardy needing to attach in this case before it can conduct its analysis of whether Fifth Amendment or other due process rights. It's unequivocal, and there is no argument in response that's actually supported by the record. I guess briefly the word has now morphed into, I'm hearing this Brady violation. Now it's morphed into a Brady violation. I think the brief started off on a Rule 412 discovery dispute. And I'm hearing a lot of things sort of live, real time, just as it relates to, I think, just making up things that didn't occur before the trial court. Can I tell you, I would like you to address the absence of the court conducting an in-camera inspection. Sure, absolutely. So here's how we phrase it, and I start by looking at the rule. The trial court still has discretion as it relates to discovery issues. And 412 does set forth an exception, right, as it relates to war product. And Judge Lynn did not make the determination on whether to conduct an in-camera review in a vacuum. He didn't. There's a significant colloquy in the actual September 2020 transcript. But there's a lot of lead up to that. And so even if you just were to hone in on the September 2020 transcript, there's a lot of lead up to that. And what is that? There had been a significant amount of motion practice and discovery that already occurred. And the court was well aware of this because it had already received grand jury transcripts. There had been a significant amount of argument as to what witnesses had actually occurred. Everybody came into the case, including Judge Lynn, with the ability, based on the prior papers, to have read about who sort of the witnesses were. And there were these no-nones. And the standard of review as it relates to here is whether or not the trial court abused its discretion. I respectfully suggest that just because a defendant makes a motion for an in-camera inspection to a trial court judge at 26 in California or any trial court judge, that it must necessarily take that and pause and go through the in-camera review of attorney's notes across the board. And it's very important to have this understanding. The defendant already had in his possession the entirety of the CPD case file. It had in there the entirety of the witness statements made to the Cook County State's Attorney's Office and the grand jury. It had the reports, the logs, the security cameras, the taxi footage, the audio and video. And as it relates to the brothers specifically, specifically as it relates to the Osindaro brothers. It sounds like you're making a harmless error argument. Well, so I start by saying I'll get to the harmless error or the lack of prejudice. But I actually do think that there is a gatekeeping function that the trial court still has discretion to make determinations on that 412. So the judge has the ability to make a determination as to what is beneficial or what may be beneficial to a defendant based on their reviewing of the documents. Or are you saying that because everybody knew everything anyway, it was just not important for them to see something that they'd already seen? And we're not talking about the entire notes of the lawyers. We're talking about the specific entries where they had an hour interview with the witnesses. That there is nothing possible that could have been in there that had been beneficial that should have been disclosed. Correct. And there's a colloquy where he asks the OSP about that and what's in it. And trial courts, by the way, all the time have to make determinations as it relates to has the evidence been tendered. Yes, Your Honor, the evidence has been tendered. Well, I want a double and triple check. Please roll in your files and get it to my clerk and I'm going to spend the next two days making sure. That was not what was asked for counsel. That's not the conversation we're having. We're talking about an hour interview, I think, that I heard counsel say. So it's not in the record. They just sort of have made this up from a TMZ report, okay? They see photographs and the concept of this. I'll say this, the OSP takes very seriously its obligations to make sure that they have every single piece of paper that the Illinois law and the Illinois rules say that they are entitled to. And they did. And they received it. And the fact that, in fact, they received so much paper that on the flip side of this point, it's also in the record, they were complaining to the trial court and said, Stop. It's the Library of Congress. We can't have any more. This is their quote. This is their lawyer saying, There's so much discovery. It's the Library of Congress. We need all this time to go through it. And I'll just sort of just pivot. Even if we live in the world that, hey, does this court say, You know what, Judge Lynn, you just got that wrong. You didn't use your discretion. You didn't just use your discretion the right way. I respectfully suggest what you haven't heard. And, Judge Conlon, what you had raised is, I think, the pivot point, which is, Did it lead to prejudice? Okay? So even if this court said there's a technical violation of discovery, which, again, I respectfully suggest that there wasn't, but even assuming that the trial court did use its discretion, we now turn to what Illinois law and the First District law says. If there was a failure to comply with the discovery rules, and I'm citing from the Taylor case, the First District 2011 case, it does not require reversal absent a showing of prejudice. And the OSP did produce the Osindaro brothers' statements, including the video and the transcripts of their post-directs interviews with the Chicago Police Department and their grand jury testimony, in conjunction with a significant amount of the physical evidence, the video evidence, the text messaging, and the social media accounts, the call records and GPS data. They have an overwhelming amount. Okay? So now when we think about whether there's prejudice, I again look at the Illinois Supreme Court. What does the Illinois Supreme Court tell us? We cite the Young case. And there the defendant was not prejudiced because, even though, by the way, there had been a lack of an in-camera inspection on witness notes. There had just been a lack of in-camera inspection. But there the Illinois Supreme Court held that because the witness's testimony was not the only evidence tending to establish the defendant's guilt, there was not reversible error and it was not set down for an in-camera inspection. And I respectfully suggest that this court, again, applying the Young standard, says that you cannot say that there's reasonable doubt that Smollett would not have been convicted if the circuit court had conducted an in-camera inspection and those notes had been tendered. That's why they haven't brought a sufficiency of the evidence type challenge on this case. I respectfully suggest that it was an overwhelming amount. And the brothers themselves, if we focus on the notes of the brothers, the work product notes of the brothers, the theories, and probing the theories of the State's case, the brothers themselves were susceptible and were cross-examined for days. The one thing that is clear in the trial court record is that Judge Lynn gave them almost unfettered access to cross-examine those brothers on prior statements, on their GPS, on their social media accounts, on the text messages, on their grand jury statements, on their statements at large, their statements to the Chicago Police Department, both under video and custodial interrogation. They had unfettered, in fact, executed upon that for days, were cross-examined on those issues. So I respectfully suggest that there definitely was no prejudice. And to the extent this Court would have done it differently, as it relates to whether it would have done the in-camera review, for purposes of this appeal, for overturning that issue, I respectfully suggest they haven't met their burden, and even attempted to meet their burden on the pressure of this problem. And I think for those reasons, that issue could be comfortably supported as well. So, in sum, I firmly believe that this case is not special. This case hasn't come here because of hype or any sort of media attention. I firmly believe that the judicial process has treated this case just as this Court should, like a normal, happily appellate case sitting in 20CR, sitting in review of issues that are actually on appeal. And I suggest that when your Court do this, it affirm both the sentence and the five felony convictions of Mr. Spillett. Thank you. Unless you have any other questions. Any questions from the panel? Thank you, Mr. Weaver. Thanks. Mr. Uche, you may proceed with your rebuttal argument. Thank you. Justices, what I just heard from the Special Prosecutor, in essence, seems to be implying for an overrule of the Brady Validation Rule. In essence, the prosecutor has just argued to this Court, we gave enough, so no need to look into this one. Well, we have a case directly in point, People v. Zabo, 94, Illinois, 2D, 327, 1983, U.S. Supreme Court case. And I noticed, Justice, you pointed out, which was a legitimate question, are you trying to make a harmless error analysis? In Zabo, the Court said there is no need for that when we don't even know what was discoverable. We've not even seen what is discoverable. And I will quote Zabo because I think it's a direct response of the prosecutor. The Supreme Court said in Zabo, we simply cannot tell what opportunities for cross-examination, if any, were denied Zabo by the nondisclosure of the notes. Consequently, we cannot say either that the nondisclosure resulted in prejudicial error or that any error that occurred was harmless beyond reasonable doubt. And that's why Zabo reversed and remanded for more discovery on this issue. It is simply not enough to create an exception to the Brady Rule by saying, we have given enough. The defense spent four hours or a couple of days on cross-examination. They don't need to see this. And in trial advocacy, Your Honors, I think Your Honors can take judicial notice. One sentence, one word can change a trial. So we don't know what was said to the prosecutors. I noticed that Mr. Weaver argued to this Court that most of the contentions about the hours-long interview is somehow not on the record. Your Honors have the transcript attachments regarding this issue. Specifically, this was raised in front of the trial court. And it wasn't denied by the OSP that they interviewed the two central witnesses. But their main point to the court at the time was, this is work product. And we, our position is the court should have taken their word for it and should have followed the dictates of Zabo and done an in-camera inspection, no matter how many days it took. Due process should have applied. Mr. Ruching, as has already been pointed out, if we find that the evidence was overwhelming or the proof against Mr. Smollett was of such weight, then that error that you're alleging would be in fact harmless under the Young case. Well, under the Young case, when the Young case doesn't apply, the Zabo court may declare that those analyses don't come into play when the justices don't even know what the notes said. Had there been a situation where we knew what these notes said and there was a debate as to, I think this is prejudicial, I think this is harmless, that's something the justices would absolutely apply the Young case to and say, we don't believe or we believe this may have been prejudicial. But like the Zabo case dictates, it's directly on point. They had no idea what was said. The trial court in that case also took the word of the prosecutor by saying this was destroyed but it wasn't that serious. And the Supreme Court said, no, you have to determine what is in there, no matter how long it takes. And it's that court's reiteration of Brady that that's very important. Even if it takes four days to go through the record for a judicial clerk to do it, it must be done to protect the defendant's rights. So to the Young case, it's not applicable. Zabo is applicable in this case because no one ever got an opportunity to see whatever statements were made beyond the work product. In fact, Zabo actually points out that when an in-camera review is done, the judge then has an opportunity to tell the prosecutor to excise from the statement whatever work product is there. We just didn't have that opportunity. So, Justice Zabo, would anyone ever ask for those notes to be impounded? No, Judge, I don't believe so. I do know in terms of, in relation to this case, we had asked for an in-camera review. In terms of the impound, what do you mean for this appeal? You asked for an in-camera review that was denied. Did you ask for the notes impounded for purposes of a future appeal? No, Justice, that was never asked because we were never even given access. I guess the ultimate question is, rhetorically speaking, not to you, but rhetorically speaking, impound what? We just don't know what to impound. Will we be impounding five hours of interviews, audio interviews, written interviews? We literally don't know up until this moment. So, we don't even have the opportunity to ask for an impoundment where this court can then conduct a de novo in-camera review. Nobody knows. And, Justice, beyond that point, I'll just mention, I know the State hammered on this in their response. They mentioned several times that Mosher State, Nali Cross does not mean finality. Well, Justices, we have people, but this is Delbick in 1989, a power court case that said, upon the showing of harassment, bad faith, or fundamental unfairness, a prosecutor does not have unfettered ability to bring back a case even within Mosher State, Nali Cross. And again, we're back to square one, this idea of fairness, whether it's the Starks case that doesn't care about the Nali Cross because they're citing a Michigan Supreme Court case talking about Nali Cross, whether it's the Stepinsky case, or whether it's the Starks case, again, that doesn't care about a Fifth Amendment violation that hasn't ripened yet for trial. These courts only care about one thing. You cannot bargain away rights and privileges you don't have. You can only bargain away rights and privileges you have. The Starks prosecutors were in the middle of prosecuting that case. There was no more mechanically restraining them from going forward with their prosecution when Starks passed the test. But instead they said they're going forward. The appellate courts, the Supreme Court, restrained them based on them bargaining away their private right to prosecute the case. Likewise, in this case, there was no law preventing the prosecutors from bringing back the charges. But what restrains them is that private bargaining right they had where they bargained away a right they actually had. Of course, we'd be arguing that that right is still never unfettered based on the case law. So all rules, Your Honors, if I may, lead to the fairness road. Is it fair to take someone's, even if you put aside the community service, to take someone's $10,000 bail bond, it's now part of the city's treasury account, and to execute a contract that was ratified by a judge, the case was dismissed, and then to bring it back. If we're to go in the route of, I think, a multi-state lollipop doesn't mean finality, then we're back to people for delving. Is it then fair to bring it back since prosecutors don't have unfettered discretion? So, Judge, with that, I have nothing more to add. Those are my main points. If you have any more questions. No questions? I guess not. Thank you, Mr. Uche. Thank you, Justices. I would like to thank the attorneys for your excellent arguments. We will take the matter under advisement. Court is now in recess.